# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KAJEET, INC, | |
| *Plaintiff*, | |
| *v.* | Civil Action No. 1:20-cv-01339-MN |
| NORTONLIFELOCK INC., | |
| *Defendant*. | |

## DEFENDANT NORTONLIFELOCK INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF KAJEET, INC.'S ORIGINAL COMPLAINT

Of Counsel:

Manish K. Mehta (*admitted pro hac vice*)
Zaiba Baig (*admitted pro hac vice*)
BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
Telephone:  (312) 212-4949
Facsimile:  (312) 757-9192
Email: mmehta@beneschlaw.com
Email: zbaig@beneschlaw.com

Charanjit Brahma (*admitted pro hac vice*)
BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP
One Montgomery Tower, Suite 2700
San Francisco, CA 94104
Telephone: (628) 600-2241
Facsimile: (628) 221-5828
Email: cbrahma@beneschlaw.com

Dated:  November 25, 2020

Kevin M. Capuzzi (DE No. 5462)
BENESCH, FRIEDLANDER, COPLAN &
   ARONOFF LLP
1313 North Market Street, Suite 1201
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
Email: kcapuzzi@beneschlaw.com

*Attorneys for NortonLifeLock, Inc.*

# TABLE OF CONTENTS

Page

Table of Authorities .......................................................................................................... ii

I.      INTRODUCTION ............................................................................................. 1

II.     THE ASSERTED PATENT ............................................................................. 2

III.    NO DISPUTED MATERIAL FACT PREVENTS DISMISSAL ..................... 4

IV.     THESE CLAIMS FAIL EACH PRONG OF *ALICE'S* TWO-STEP TEST ...... 7

        A.      A Representative Claims Analysis is Appropriate ................................. 7

        B.      The Claims Fail Step One of the *Alice* Test .......................................... 9

                1.      Analogous case law confirms that management of functions
                        based on policies is abstract. ................................................... 10

                2.      The claims merely capture human activity. .............................. 12

        C.      The Claims Fail Step Two of *Alice* Because They Lack an
                "Inventive Concept." ........................................................................... 13

                1.      The claimed elements and functions are generic and
                        conventional. ........................................................................... 14

                2.      The claims, as a whole, are unpatentable. ................................ 16

                3.      The claims lack any improvement over conventional
                        technology. ............................................................................... 17

        D.      The *Qustodio* Decision Does Not Save the '559 Patent. ..................... 19

V.      CONCLUSION ............................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*,
  782 F.3d 1336 (Fed. Cir. 2013)............................................................7, 9

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l.*
  134 S. Ct. 2347 (2014).......................................................... *passim*

*B# on Demand LLC v. Spotify Tech. S.A.*,
  No. CV 19-2077-RGA, 2020 WL 5369185 (D. Del. Sept. 8, 2020) ............... *passim*

*Bilski v. Kappos*,
  561 U.S. 593 (2010)...................................................................8

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
  859 F.3d 1352 (Fed. Cir. 2017), *cert. denied*, 138 S. Ct. 2621, 201 L.Ed.2d
  1026 (2018)...........................................................................7

*Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*,
  776 F.3d 1343 (Fed. Cir. 2014)........................................................7

*Elec. Power Grp., LLC v. Alstom S.A.*,
  830 F.3d 1350 (Fed. Cir. 2016)..............................................9, 15, 16

*Intellectual Ventures I LLC v, Capital One Bank (USA)*,
  792 F.3d 1363 (Fed. Cir. 2015).......................................................12

*Intellectual Ventures II LLC v. JP Morgan Chase & Co.*,
  No. 13-cv-3777 (AKH) 2015 WL 1941331 (S.D.N.Y. April 28, 2015)................15

*Interval Licensing LLC, v. AOL, Inc.*,
  896 F.3d 1335 (Fed. Cir. 2018).......................................................15

*Kajeet, Inc. v. Qustodio, LLC*,
  No. 18-cv-01519 JAK, 2019 WL 8060078 (C.D. Cal. Nov. 1, 2019)..............19, 20

*Manual Enterprises, Inc. v. Day*,
  82 S. Ct. 1432 (1962)................................................................13

*Money & Data Prot. Lizenz GMPH & Co. KG v. Duo Sec., Inc.*,
  No. CV 18-1477-CFC, 2020 WL 3453127 (D. Del. June 24, 2020)............8, 11, 12

*Prism Techs. LLC v. T-Mobile USA, Inc.*
  696 Fed. App'x 1014 (Fed. Cir. 2017) ......................................12, 13, 15

*SynKloud Techs., LLC v. HP Inc.*,
2020 WL 5798725 ................................................................................ *passim*

*In re TLI Commc'ns LLC Patent Litig.*,
823 F.3d 607 (Fed. Cir. 2016)..........................................................13, 14

*Ultramercial, Inc. v. Hulu, LLC*,
772 F.3d 709 (Fed. Cir. 2014)..................................................10, 11, 16

*Uniloc USA, Inc. et al., v. ADP, LLC et al.*,
772 Fed. Appx. 890 (Fed. Cir. 2019) (unpublished)........................ *passim*

**Statutes**

35 U.S.C. § 101 .................................................................................. *passim*

35 U.S.C. § 102 ...........................................................................................4

**Other Authorities**

Fed. R. of Civ. P. 12(b)(6) ...........................................................................7

## I.    INTRODUCTION

United States Patent No. 8,667,559 ("the '559 patent") seeks to monopolize the concept of access management.  The patent was prosecuted at a time when it was still unclear whether one could be rewarded with a patent for automating human activity by replacing it with a series of general purpose computing devices.  But there has been a fundamental shift in the law of patentable subject matter since the '559 patent issued, and no such ambiguity remains.  In its Complaint against Defendant NortonLifeLock Inc. ("NortonLifeLock"), Plaintiff Kajeet, Inc. ("Kajeet") has admitted, and also conceded in prior proceedings, that the '559 patent is merely directed to "policy-based controls on communication devices."[1]  This concept, as discussed below, has repeatedly been held to be an abstract idea and not patent-eligible subject matter under 35 U.S.C. § 101.

Having watched its other patents in the '559 patent family fall to challenges under § 101 for claiming an abstract idea, Kajeet attempts to distinguish the '559 patent by alleging its claims are directed to the purportedly inventive concept of a "distributed architecture" in which the policy is stored remotely from the computing device.  Dkt No. 1, ¶ 37.  But this argument fares no better in distinguishing these claims over those previously invalidated.  First, none of the so-called "technological improvements" of this "distributed architecture" that Kajeet touts in its Complaint are mentioned anywhere in the claims or specification of the '559 patent.  Nor does the combination of these components recite any advance in technology, because the claimed systems and methods still perform routine access management using conventional and generic components over a network.  Even if Kajeet's conclusory allegations could rewrite the claims and specification, Kajeet's argument would still be merely a diversion from the appropriate inquiry.  The patent-eligibility analysis focuses on the claims as a whole, and none of the claims recite any language

---

[1] *Kajeet, Inc. v. Qustodio, LLC*, No. CDCA-8:18-cv-01519 JAK (PLA), Dkt No. 43 at 13, December 21, 2018 (Ex. A).

regarding the ostensibly improved security or efficiency Kajeet tries to read into them. Because the claims are squarely directed to the abstract idea of policy-based access management and rely upon routine steps and conventional technology, the '559 patent fails the *Alice* test. Accordingly, this Court should hold the '559 patent invalid under § 101 and dismiss this case.

## II.     THE ASSERTED PATENT

The '559 patent, entitled "Feature Management of a Communication Device," claims the concept of evaluating a request by a computing device (such as a request to communicate with another device) based on a policy that is stored remotely from the computing device. *See, e.g.*, Ex. B at claims 1 and 27. This claimed concept includes the device sending a request to communicate with another device, receiving a response indicative of a decision denying or granting that request based on a policy stored at a server, and enforcing the response on the device. *Id.* At its core, the claims capture nothing more than access management.

The '559 patent sought to manage human behavior by "preventing access to features deemed inappropriate" on a computing device while "providing access to desirable features." Dkt No. 1, ¶ 18. The Background identified a number of prior art "partial solutions" to this problem— solutions that are in fact (improperly) captured by the claims, such as "establish[ing] some measure of parental or administrative control over an account" where "parental controls over that account can be set to limit that child's spending within a set of parameters." Ex. B at 3:47-59. However, these solutions allegedly did not resolve the issue of "providing limits on overspending and other activities by the user while simultaneously assuring that the user will always be able to use the phone when appropriately needed." *Id.* (emphasis added).

The specification places the purported problem in context, using as an example a behavioral problem that is technology agnostic. According to the specification, postpaid mobile phones (*i.e.*, where charges accrue and are paid after incurred) were financially detrimental to their

owners (*e.g.*, parents or administrators) because they did not provide a measure for stopping the "user from running up a huge cell phone bill." *Id*. at 1:66-2:2. The patent acknowledged that this was a well-recognized problem in human behavior: "Many parents experienced this issue with their children . . . [and] the same type of issue exist[ed] between employers and employees and other parties in similar administrator/user relationships with respect to the use/abuse of cell phones and other devices." *Id*. at 2:2-13.

To address this problem, the "invention" captured by the claims simply adopted the same rule-based approach humans have used to control others' behaviors since the beginning of time. The claims are directed to "granting" or "denying" a "request" of a computing device to communicate with another device based on a "policy", where "the communication [is] enabled or disabled" "without storing the policy on the computing device". *See, e.g.*, *id*. at claim 27. In the context of the stated "problem," these policies were designed to prevent the unauthorized use of cell phones to "make[] and receive[] calls, exchange[e] data, play[] games and music, send[] and receiv[e] email, access[] web sites, and pay[] for goods and services."[2] *Id*. at Abstract. For example, a policy may prevent the user from accessing entertainment (*e.g.*, a game) stored on the device for a particular reason, "such as the wrong time of the day, the wrong day of the week, the game has been played in excess of some time limit set on the game, etc." *Id*. at 9:6-11. This alleged benefit has no discernible difference from a parent setting rules for their children's access to entertainment or from the prior art "partial" solutions described in the Background of the '559 patent.

---

[2] While there are unsupported allegations throughout the Complaint and declaration that "remote storage" of policies makes them less vulnerable to manipulation, or deletion, the '559 patent specification fails to recognize this as a purported benefit or improvement over the prior art. Dkt No. 1, ¶¶ 16, 19, 35, 37, 38. Nor are there such limitations found in the claims themselves.

To implement this age-old concept within the computer environment, the claims simply recite generic, well-known techniques for managing functions available to a user according to administrative policies, *i.e.*, access management. The claims incorporate generic technology, such as a "computing device," "server," "switch," and "memory," where the policies are housed in a different location, *e.g.*, the server, than the computing device. But tellingly, neither the claims nor the specification offer a unique or unconventional way to use this well-known technology and techniques of applying policies to control user access.

## III.    NO DISPUTED MATERIAL FACT PREVENTS DISMISSAL

There are no material facts in dispute that would preclude the Court from granting this Motion. The Complaint is silent on whether the asserted patents claim "abstract ideas" under step one of *Alice*. Instead, the Complaint alleges that the asserted patents satisfy step two of *Alice* because the "limitations capture the ***distributed architecture*** concept not well-understood, routine, or conventional in the art for effecting feature management on a computing device including that the server storing the policies upon which decisions are based being meaningfully apart from the computing device."[3] *See* Dkt No. 1 at ¶ 35 (emphasis added); *see also id*. at ¶ 39. As made clear in its pleading, Kajeet improperly conflates the issue of patent eligibility under §101 with that of novelty. Even if the Court were to accept as true the allegation that Kajeet thought of a novel solution, that an idea may be "groundbreaking, innovative, or even brilliant" does not satisfy § 101. *See SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1163 (Fed. Cir. 2018) (internal quotation and citations omitted).

---

[3] Kajeet's reliance on an excerpt of the file history of the '559 patent for support of this proposition is misplaced as this statement was made by the Applicant, not the Examiner, in response to an anticipated rejection under 35 U.S.C. § 102, and was not adopted by the Examiner. (Dkt No. 1, ¶ 18). Therefore this allegation is no less self-serving than the other conclusory allegations made in the Complaint.

Instead, the inquiry at step 2 must focus on how the "additional features" individually, or in combination, amount to anything more than "well-understood, routine, conventional activity." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1294 (2012). Kajeet alleges that the "inventive concept" is derived from "storing usage policies upon which decisions are based at a server remote from the computing device, an unconventional arrangement at the time which yielded improvements in the operation of systems implementing the claimed methods." (Dkt No. 1 at ¶ 38). However, Kajeet raises no facts, let alone any that would present a material dispute, to support this allegation to preclude a finding of invalidity at this stage.

Indeed, the Complaint, makes conclusory assertions and attorney argument about the technology as a whole, characterizing the remote storage feature as an "unconventional scheme" (Dkt No. 1 at ¶ 19), that "improved operation through at least increased resilience to undesirable access to policies to manipulate or delete [policies]" (*id*. at ¶ 35), where "[e]ffecting control over [an] incoming communications to a communication device was likewise not well-understood, routine, or conventional to one of ordinary skill in the art" (*id*. at ¶ 36). While Kajeet points to its previously proffered expert declarations of Dr. Charles Knutson ("the Knuston Declarations")[4], his opinions are similarly unsupported and conclusory, failing to provide a reason *why* the specific remote storage concept captured by the claims resulted in a departure from the benefits of the well-known and conventional technology. *See* Ex. C, ¶ 29 ("Each [claim] requires storing usage policies remotely from the managed devices, an unconventional arrangement at the time which yielded improvements in the operation of such systems."); *see also id*. at ¶¶ 18, 24, 67 (alleging benefits of remote policy storage, but failing to articulate why such benefits were attributable to something other than routine technology or well-known functionality).

---

[4] Referenced in Complaint (Dkt No. 1 at ¶ 38, n. 2), and reproduced here as Exhibits C and D.

Courts have routinely refused to credit such allegations that merely "restate the claim elements and append a conclusory statement that 'nothing in the specification describes these concepts as well-understood, routine, or conventional.'" *Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F. App'x. 529, 538 (Fed. Cir. 2020) (internal citations omitted) (declining to accept as true conclusory allegations in complaint that "[t]he inventions described and claimed in the [patent] solved these problems" or that "'[t]he [patent] describes and claims a number of novel and inventive approaches to data backup . . . captured in' the claims of the patent"). Likewise, Kajeet's conclusory characterization that the remote policy storage was "an unconventional arrangement" should be ignored. (Dkt No. 1 at ¶ 38).

First, such benefits are neither found in the claims nor in the specification, therefore undermining how these claims could impart such an inventive concept.[5] *RecogniCorp, LLC v. Nintendo Co., Ltd.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017) ("To save a patent at step two, an inventive concept must be evident in the claims.") Second, the record fails to explain ***why*** the claims confer this alleged benefit but conventional technology did not. *Natera, Inc. v. ArcherDX, Inc.*, No. 20-125-LPS, 2020 WL 6043929, at *8 (D. Del. Oct. 13, 2020) (Stark, J.) (holding no factual disputes preclude a finding of invalidity under § 101 at the motion to dismiss stage notwithstanding an expert declaration where "many of the factual allegations on which plaintiff relies are merely conclusory and do not need to be credited for this reason as well"); *see also Move, Inc. v. Real Estate All. Ltd.*, 721 F. App'x 950, 957 (Fed. Cir. 2018) (rejecting that conclusory allegations in expert declaration that claimed technology was "neither routine nor conventional"

---

[5] The Complaint alleges that the so-called security benefits addressed the alleged problem that policies were "vulnerable to manipulation and deletion." (Dkt No. 1 at ¶ 37). However, this problem is not the one identified by the '559 patent relating to managing human behavior, as explained *supra* at Section II.

without supporting citations or rationale as nothing more than a "bald assertion [that] does not satisfy the inventive concept requirement.")  Therefore, no disputed material fact precludes dismissal at this stage.

## IV.    THESE CLAIMS FAIL EACH PRONG OF *ALICE'S* TWO-STEP TEST

Where, as here, the complaint fails to state a claim upon which relief can be granted, a party may move to dismiss it under Federal Rule of Civil Procedure 12(b)(6).  The § 101 inquiry is properly raised at the pleadings stage if it is apparent from the face of the patent that the asserted claims are not directed to eligible subject matter.  *See Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017), *cert. denied*, 138 S. Ct. 2621, 201 L.Ed.2d 1026 (2018).  This Court routinely decides patent ineligibility at the pleadings stage.  *See, e.g.*, *B# on Demand LLC v. Spotify Tech. S.A.*, No. 19-2077-RGA, 2020 WL 5369185 (D. Del. Sept. 8, 2020).

### A.    A Representative Claim Analysis is Appropriate.

The *Alice* test may be properly applied to invalidate all claims of the '559 patent as patent-ineligible where, as here, one analyzed claim is representative of the rest.  *See, e.g., Alice*, 134 S. Ct. at 2359-60.  The only claim discussed in the Complaint—claim 27—is representative.  All of the claims of the '559 patent "recite little more than the same abstract idea" of providing access to functions based on policies and are confined to "well-known, routine, and conventional" technology.  *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l. Ass'n*, 776 F.3d 1343, 1348-49 (Fed. Cir. 2014).  They "contain only minor differences in terminology but require performance of the same basic process," and "should rise or fall together."  *Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1344 (Fed. Cir. 2013) (internal citation and quotations omitted).

Indeed, Kajeet admits that "claim 1 of the '559 Patent, and correspondingly the dependent

claims thereof, are directed to *similarly* configured systems and methods for effecting remote management of communications devices" to those covered by claim 27 and its corresponding dependent claims. Dkt No. 1 at ¶¶ 37-38 (emphasis added). The remaining independent claims 1, 13, and 22 differ from claim 27 only slightly in wording. All of these claims are commonly directed to the remote policy concept and require processing a request to run a function, accessing a decision stored on a computing device, and determining whether the request should be granted based on the policies—all non-distinctive elements. *See, e.g.*, *Money & Data Prot. Lizenz GMPH & Co. KG v. Duo Sec., Inc.*, No. 18-1477-CFC, 2020 WL 3453127, *4 (D. Del. June 24, 2020) (finding that additional limitations had no "distinctive significance" over the representative claim).

The dependent claims fare no better, as each either further defines the **same** abstract idea (*e.g.*, **type** of policy, as in dependent claim 28) or simply adds insignificant pre- or post- solution activity to that abstract idea (*e.g.*, dependent claim 30) in a doomed attempt to limit that abstract idea to a particular environment. Such window-dressing cannot confer independent patent eligibility where there was none to begin with. *See, e.g.*, *Bilski v. Kappos*, 561 U.S. 593, 610-11 (2010) (holding that the "prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of the formula to a particular technological environment or adding insignificant post-solution activity") (internal quotations omitted). Therefore, a finding that representative claim 27 of the '559 patent is unpatentable under 35 U.S.C. § 101 should extend to all of the remaining claims—both independent and dependent—of the asserted patent.[6]

---

[6] Should Kajeet separately argue the patentability of any other claim, NortonLifeLock reserves the right to address such claim in its reply brief.

**B.     The Claims Fail Step One of the *Alice* Test.**

The claims fail to satisfy the first prong of *Alice*, because the claimed concept of limiting access to functions based on policies, *i.e.*, "rules," is an abstract idea.[7]  *See, e.g., B# on Demand LLC*, 2020 WL 5369185, at *13 ("The claims use a wholly generic computer system to obtain functional results of limiting access to distributed media based on predetermined rules with no technical detail describing how to achieve those results.  In sum, the Asserted Patents claim an abstract idea.").  The first step of *Alice* requires the court to "identify and define whatever fundamental concept appears wrapped up in the claim," *Accenture Glob. Servs.*, 728 F.3d at 1341, and in turn, the "focus" and "character" of the claims must be assessed in light of the specification. *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016).

At its core, claim 27 is directed to "managing" or "controlling" a "computer device" that issues a "decision" to "grant" or "deny" a "request" based on a "policy," where that policy upon which the decision is made and enforced is not "stored on" the computing device.  When stripped of the generic technical jargon of the non-inventive elements, claim 27 is laid bare as directed to nothing more than the abstract idea of access control over functions based on policies.[8]

Kajeet agrees.  Kajeet alleges "[c]laim 27 … and each claim depending therefrom are rooted in control schemes for managing communication devices and require the application of decisions based upon remotely stored polices" and "claim 1 …, and correspondingly the dependent

---

[7] Even if Kajeet now argues that the "remote" location of the policies limits the claim's core concept, the outcome is the same, as the cited cases dealt with the remote storage aspect of their respective claimed inventions at step 1 of the *Alice* analysis and still concluded that the concept of access management is abstract.

[8] It is proper to disregard the generic technical components of the claims because they do not alter the abstract nature of managing access to functions.  *See Alice*, 134 S. Ct. at 2352 n. 2, 2356 (disregarding limitations such as the shadow credit record and shadow debt record to hold that the claims were directed to the abstract idea of "intermediated settlement").

claims thereof, are directed to similarly configured systems and methods for effecting remote management of communications devices." Dkt No. 1 at ¶¶ 37, 39. Kajeet has also previously conceded that the claims are "directed to systems and methods for effecting policy-based controls over communication devices." Ex. A at 13. Therefore, it is undisputed that the focus and character of the claims is directed to access management—an abstract idea. *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014) (holding that a process that only permitted consumer access to media after certain activities was directed to "an abstract idea, devoid of a concrete or tangible application").

### 1. Analogous case law confirms that management of functions based on policies is an abstract idea.

Just last year, the Federal Circuit found a nearly identical concept directed to access management based on remotely stored policies to be an abstract idea and invalid under § 101. *Uniloc USA, Inc., v. ADP, LLC*, 772 F. App'x. 890, 901-902 (Fed. Cir. 2019) (unpublished). In *Uniloc*, the Federal Circuit held that patent claims of U.S. Patent No. 6,728,766 ("the '766 patent," Ex. E) directed to "a network architecture that enables user-specific license management over a network" captured an abstract idea under step 1. *Id*. at 901. There, the claims at issue "provid[ed] an unavailability indication ... or an availability indication," based on "at least one of a user identity based policy, an administrator policy override definition or a user policy override definition." *Id*. (citing the '766 patent). Notably, and of particular relevance here, the claims of the '766 patent required that the "license management policy information" be housed in a "licensing management server" that was remote from the "client." Ex. E at claim 1 (a method requiring "***receiving at the license management server*** a request for a license availability . . . ***from a user at a client***," "***determining the licensing availability*** … based on the maintained license ***management policy*** information," and "***providing*** an unavailability ***indication to the client*** ….") (emphases added). In

sum, these claims captured the same concept of access management using policies as embodied in claim 27 of the '559 patent.

In holding the claimed concept abstract, the Federal Circuit reasoned that "[c]laim 1 does not go beyond requiring the collection, analysis, and display of available information. The information being collected is who the user is, tested against the user identity policy, with a resulting display of authorization. This is not an improvement in network architecture—it is the use of a computer as a tool to process information." *Uniloc*, 772 F. App'x. at 901 (internal citations and quotations omitted). The concept captured in claim 27 is no different than the one in *Uniloc*— both are directed to controlling access based on certain conditions and policies. Therefore, *Uniloc* supports finding that claim 27's core concept of limiting access to content or information remains an abstract idea. *See also Ultramercial, Inc.*, 772 F.3d at 715 (holding that a process that only permitted consumer to access media after certain activities were completed was essentially an abstract idea, devoid of a concrete or tangible application).

This Court has also routinely found that managing access to functions based on predetermined rules, or "policies," is an abstract idea. For example, earlier this year, Judge Andrews held that "limiting access to distributed media based on predetermined rules" is an abstract idea. *B# on Demand LLC*, 2020 WL 5369185, at *11. The Court reasoned that testing a user's access to digital files against a license authorization, *i.e.*, a user identity-based policy, was "not an improvement in network architecture" but rather "the use of a computer as a tool to process information—an "abstract idea." *Id*. Likewise, in *Money & Data Protection*, Judge Connolly held that claims directed to the "verifying identity to permit access to transactions" were nothing more than methods of restricting access based on policies and were therefore directed to an abstract idea. 2020 WL 3453127, at **2-4. Finally, in *SynKloud Techs, LLC v. HP Inc.*, Judge Andrews

concluded that claims describing "storing data in or retrieving data from a remote location" captured the "well-known and longstanding practice of requesting an institution to obtain data from remote locations and to store that data in storage space assigned to a specific user." No. 19-1360-RGA, 2020 WL 5798725, at *8 (D. Del. Sept. 29, 2020) ("Remotely accessing and retrieving user-specified information is an age-old practice that existed well before the advent of computers and the Internet." (citation omitted)). Thus, Federal Circuit precedent and this Court's own precedent confirm that this concept is abstract and warrants a similar finding here.

### 2. The claims merely capture human activity.

The claims also fail step 1 of *Alice* because they capture a concept that merely mimics human activity, which has long been held abstract. *Id.* (claims directed to "longstanding practices of human organization" are abstract ideas); *see also Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015) ("[T]racking financial transactions to determine whether they exceed a pre-set spending limit (i.e., budgeting)" is an abstract idea because it "involve[s] methods of organizing human activity."). As discussed in Section II, using the '559 patent's own examples, parents have been setting rules for their children since the dawn of civilization, a human activity that renders these claims abstract under this additional line of reasoning.

*Prism Techs LLC v. T-Mobile USA, Inc.*, is particularly instructive here. 696 F. App'x 1014 (Fed. Cir. 2017). In that case, the Federal Circuit agreed that the "claims recite ineligible subject matter because they . . . are directed to the abstract idea of controlling access to resources" and "humans similarly restrict and provide access to resources." *Id.* at 1017; *see also Money & Data Prot.*, 2020 WL 3453127, at *2 (finding that patent claims directed to user authentication were "not materially different from the patent at issue in *Prism Techs.* . . . directed to the abstract idea of providing restricted access to resources (internal quotations omitted)).

12

Like the concept underlying the claims at issue in *Prism Techs.*, the focus of the claims here is similarly directed to restricting access to functions based on policies—a function with which any parent of a teenager with a phone is intimately familiar. The concept captured by the claims is analogous to many things, including parenting, which is a bedrock organizing concept of human civilization. Likewise, businesses and government routinely engage in similar restrictions of access, *e.g.*, limiting confidential information to only those who can establish that they are allowed to obtain such information. For example, the Comstock Act, passed by Congress in 1873 restricted any individual from selling or sending what was considered obscene or illicit material through the mail. *Manual Enters., Inc. v. Day*, 82 S. Ct. 1432, 1433 (1962). This prohibition was aimed at curbing human behavior based on a rule that was set by a governing body. Indeed, the examples of this very basic concept are endless. Because the concept captured by the claims is indistinguishable from managing normal, regular human activity (*e.g.*, parenting), the '559 patent fails step 1 of the *Alice* test and does not claim patent-eligible subject matter. *See Prism Techs.*, 696 F. App'x at 1017.

C. **The Claims Fail Step Two of *Alice* Because They Lack an "Inventive Concept."**

The claims of the '559 patent also fail to satisfy the second prong of *Alice*, because they lack any "inventive concept." *Alice*, 134 S. Ct. at 2357. Representative claim 27 recites conventional technologies in their most generic forms to perform standard functions to achieve the remote storage of policies—nothing that presents an improvement upon a technological process. *B# on Demand LLC*, 2020 WL 5369185, at *13 (finding no inventive concept behind the abstract idea of limiting access where "[t]he patent does not explain how this process is carried out in a way that does not merely employ the conventional functions of computers.") Such well-known technologies merely provide a "generic environment" in which to execute the abstract idea; this does not make the idea patentable. *See In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611

(Fed. Cir. 2016).

The claims also fail the second step of the *Alice* analysis because they recite these generic technologies to accomplish merely conventional steps. *See, e.g.*, *SynKloud Techs., LLC*, 2020 WL 5798725 at *9 (finding inventive concept lacking where there were no "specific improvements in [Plaintiff's] asserted combination of conventional pieces"). Under the second prong of *Alice*, the Court "must examine the elements of the claim[s] to determine whether [they] contain[] an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 134 S. Ct. at 2357 (internal citation and quotations omitted). The inclusion of claim components or functions described in "purely functional and generic" terms do not impart patent-eligibility. *Id*. at 2360.

### 1.     The claimed elements and functions are generic and conventional.

The lack of improvement embodied by the claims is underscored by the conventional nature of the claimed components. The fact that the policies are remote from the computer is nothing more than a function of where the policies are stored (*i.e.*, on a server) across a standard network; the claims do not present an innovative or unconventional way that the access management is performed.

Each of the recited components is used for nothing more than its well-known, generic purpose. Where hardware and software components are used for their purely functional and generic use, no inventive concept is imparted. The claimed "computing device," "network," "server," and "memory," are generic components that do not impart an inventive concept. *See, e.g.*, *SynKloud Techs.*, 2020 WL 5798725 at *9 (recognizing computers, networks, and servers as generic components); *In re TLI Commc'ns LLC Patent Litigation*, 823 F.3d at 615 (holding that "vague, functional descriptions of server components are insufficient to transform the abstract idea into a patent-eligible invention"). The functional language of the claims that involves

14

communication activity across a network is also conventional and generic, further underscoring the lack of any inventive step here. *SynKloud Techs.,* 2020 WL 5798725 at *9 ("Courts have routinely determined that the use of a computer network does not confer eligibility."). There can be little dispute that the functions of "sending" and "receiving" over a "communication network" and in "real time" are age-old concepts. *Id.*; *see also Uniloc,* 772 F. App'x. at 902 (noting that "real-time availability of information is a staple of a conventional network").

The remaining functions of claim 27 are equally conventional and generic. For example, the function of "enforcing" the decision is a purely conventional computer function in the context of each claim of the '559 patent. *See Intellectual Ventures II LLC v. JP Morgan Chase & Co.*, No. 13-cv-3777 (AKH), 2015 WL 1941331, at *14 (S.D.N.Y. April 28, 2015) ("The use of an 'access mechanism' to enforce the pre-selected rules is nothing more than programming conventional software or hardware to apply rules governing access–a routine, conventional practice.") This function merely invokes running generic computer hardware to perform the abstract function of enforcing. *See Prism Techs.*, 696 F. App'x at 1017–18. The specification's failure to describe this function beyond its generic nature confirms the conventional computer functionality. Claim 27 of the '559 patent fails to specify how the decision is enforced, or how such enforcement with a conventional device over a generic communication network is extraordinary and inventive. The specification is likewise silent. This sort of functional, results-oriented language, devoid of specific instructions, "has been a frequent feature of claims held ineligible under § 101." *Elec. Power Grp., LLC*, 830 F.3d at 1356.

The generic function of enabling or disabling communication as recited by claim 27 of the '559 patent is yet another claim limitation that fails to impart inventiveness. *Interval Licensing LLC, v. AOL, Inc.*, 896 F.3d 1335, 1347 (Fed. Cir. 2018) (One cannot "contend that it is arguably

inventive to enable a person to access information over a network through a user interface.").  Nor is it inventive to do so without the policy being stored on the computing device.  *See Uniloc*, 772 F. App'x. at 901-02 (finding that similar remote policy architecture failed to impart an inventive concept).  The policy necessarily has to be stored somewhere, which further evidences that this a purely generic limitation without any inventiveness.  *Id*.  Similarly, the specification of the '559 patent discloses nothing remarkable or inventive about  storing the policy not on the computing device.  *Electric Power* explained that even when the type of information (in other words data) at issue is specific, that "does not change its character as information."  830 F.3d at 1353.

In summary, the claims are directed to abstract ideas and recite nothing beyond generic technologies performing their routine and conventional functions.  The location of the policies, without more, cannot impart a technological improvement that warrants a finding of an inventive concept.  Accordingly, the claims fail to transform their underlying abstract idea into patent eligible subject matter.  The Supreme Court has made clear that limiting the field of use of the abstract idea to a particular existing technological environment does not render the claims any less abstract.  *See Alice*, 134 S. Ct. at 2358.

## 2. The claims, as a whole, are unpatentable.

Even when their elements are analyzed as "an ordered combination," the claims do not recite patent-eligible subject matter.  After all, the claims only call for using policies to limit access to functions of a computing device using well-known and conventional activities.  As the *Uniloc* court noted, "[t]here is nothing unconventional about the ordered combination that is not merely the sum of the parts."  772 F. App'x. at 900 (internal quotation omitted); *see also Ultramercial*, 772 F.3d at 716 (holding that even the combination of eleven steps does not transform the nature of the claim when they do nothing more than recite routine, conventional activity).  But that is exactly what is at issue here: an access management system that implements routine technology

pursuant to its well-known functions.

Nor can the remote policy concept support an inventive concept where the claims in practice do not amount to "significantly more than a patent upon the ineligible concept itself." *B# on Demand LLC*, 2020 WL 5369185 at *14 (internal quotations omitted). As discussed above in Section III.C.1., the components specified by the claims are nothing more than conventional features that are performing according to their customary functions that cannot impart an inventive concept. *Id.* (finding claims directed to "abstract idea of limiting access to distributed media based on predetermined rules, implemented on conventional, well-known hardware, adding no inventive concept."). Therefore, even when taken as a whole, the claims do not impart an inventive concept.

### 3. The claims lack any improvement over conventional technology.

Nor do these claims satisfy the second step of *Alice* by providing a new solution for a technological problem. Kajeet's so-called "improve[ment of] the security, effectiveness, and robustness of control accommodated" that is allegedly captured by the claims lacks merit for at least two reasons. (Dkt No. 1 at ¶ 37).

First, there is simply no basis in the claims to arrive at this conclusion. Indeed, these alleged benefits are not referenced by the specification nor are they found in the claims themselves either expressly or inherently. *Pivital IP LLC v. ActiveCampaign, LLC*, No. 19-1590-LPS, 2020 WL 6043919, at *3 (D. Del. Oct. 13, 2020) (Stark, J.) ("there is not sufficient specificity of that purported technical solution to a technical problem captured in the claims to allow the claims to survive the motion to dismiss" under 35 U.S.C. § 101); *SynKloud Techs.*, 2020 WL 2798725 at **13-14 (finding that claims did not capture any particular improvement because the claims "add[ed] nothing to describe an inventive concept nor any detail for implementation"). The claims merely recite technological elements, with routine functions, used in a conventional way to manage access based on policies. The claims neither improve an existing technology or field, nor do they

"purport to improve the functioning of the computer itself or effect an improvement in any other technology or technical field." *Alice*, 134 S. Ct. at 2359.

Tellingly, the Complaint alleges that the problem to be solved was related to policy "manipulation and deletion" in order for Kajeet to rally around this alleged security benefit of remote policy management. (Dkt No. 1 at ¶ 37). However, Kajeet manufactured this so-called problem out of thin air, as this problem is not identified anywhere in the '559 patent and, in fact, is at odds with the stated problem identified in the '559 patent's Background section of "providing limits on overspending and other activities by the user while simultaneously assuring that the user will always be able to use the phone when appropriately needed." Ex. B at 3:54-59. Kajeet's attempts to cure the flaws of the patent through *post hoc* attorney rationalization in its Complaint are improper. *SynKloud Techs.,* 2020 WL 5798725 at *1 ("[A] court need not accept as true allegations that contradict matters properly subject to judicial notice or by exhibit, ***such as the claims and patent specification***.") (Andrews, J.).

Second, even if the claims did impart an inherent security benefit merely because the claimed policies are located on a remote server (which they do not), the Federal Circuit has rejected such benefits, finding them conventional and routine. *See Uniloc,* 772 F. App'x. at 902 (finding that an architecture involving remotely stored policies on a server and returning a decision based on those policies was not unique or unconventional to support an inventive concept). The customary function of such a system is also not sufficient to satisfy this requirement. *Id.* (no inventive concept where "[t]he licensing policy determines authorization to an application like a conventional licensing policy, the server stores and delivers the authorization information like a conventional server, and the notification notifies the user in a conventional way."). This Court has also recognized the same by concluding that there was no inventive concept for an abstract idea of

"limiting access to distributed media based on predetermined rules" that invoked generic components that perform according to their well-known and conventional functions. *B# on Demand LLC*, 2020 WL 5369185 at **13-14. Therefore, contrary to Kajeet's allegation otherwise, any "benefits" conferred by the claims do not offer any particular "improvement" over that provided by routine and conventional technology.

### D. The *Qustodio* Decision Does Not Save the '559 Patent.

Kajeet previously asserted the '559 patent and two others in the same family—U.S. Patent Nos. 8,630,612 ("the '612 patent") (Ex. F) and U.S. Patent No. 8,712,371 ("the '371 patent") (Ex. G) against another accused infringer in the Central District of California. *See Kajeet, Inc. v. Qustodio, LLC*, No. CDCA-8:18-cv-01519 JAK (PLA). All three patents share the same title and an identical specification. *Compare* Exs. B, F, and G. Pursuant to a motion to dismiss under 35 U.S.C. § 101, the *Qustodio* court held that the core idea of "using policies to generate and enforce decisions in one or more computing devices, e.g., the abstract idea of allowing/disallowing functions based on policies," failed to satisfy the first step of the test in *Alice*. *Kajeet, Inc. v. Qustodio,LLC*, No. 18-cv-01519 JAK, 2019 WL 8060078, *17-18 (C.D. Cal. Nov. 1, 2019). With respect to step two of *Alice*, the *Qustodio* court found "[r]emote policy storage" to be "critical and central to" Kajeet's argument regarding the alleged utility of its purported inventions. *Id.* at 18. But it also found that the claims of neither the '371 patent nor the '612 patent required such remote policy storage. *Id.* The court further found that Kajeet's complaint did "not otherwise allege that the individual claim elements represent anything other than well-understood, routine, and conventional computer components," and that the terms "policy deciders," "policy enforcers," "switch[es]," and "node[s]," were all familiar, routine, and conventional components. *Id.* Based on these findings, the *Qustodio* court held the '612 and '371 patents invalid for failing to claim patent eligible subject matter, and dismissed Kajeet's infringement claims relating to those patents

with prejudice. *Id*. at 18-20. But for the '559 patent, the *Qustodio* court accepted, without evaluating, Kajeet's allegations that the claims required policies to be stored remotely from the claimed communication devices and "that this claim is at least drawn to a non-conventional arrangement of claim elements." *Id*. at 20. Because it accepted those allegations at this initial stage of the case, the *Qustodio* court denied the motion to dismiss infringement claims based on the '559 patent ***without prejudice***. *Id*.

The non-final, non-binding *Qustodio* decision should not compel this Court to arrive at a similar conclusion here.[9] The controlling law in this District, including decisions that issued post-*Qustodio*, demonstrate that similar claims must be struck down under § 101, and therefore, support a ruling that the '559 patent fails to claim patentable subject matter. Indeed, as this Court has recognized, "a valid and independently sufficient approach to resolving a 101 dispute is to find what are the most analogous cases that have already been decided, and to reason from those analogies. . . ." *Pivital IP LLC*, 2020 WL 6043919, at *2. As discussed *infra*, in Section III, the Federal Circuit's and this Court's recent § 101 decisions invalidated claims directed to access control based on remotely stored policies and support the same outcome here.

## V.    CONCLUSION

For the reasons set forth above, this Court should grant NortonLifeLock's motion to dismiss the complaint because the '559 patent fails to satisfy 35 U.S.C. § 101.

---

[9] Kajeet has also asserted the '559 patent against Gryphon Online Safety, Inc. ("Gryphon") in this District. (Case No. 1:19-cv-02370-MN). Gryphon filed a motion to dismiss under § 101 that is fully briefed and pending before this Court. NortonLifeLock requests that the Court consider NortonLifeLock's motion before ruling on the motion in the *Gryphon* case.

Dated: November 25, 2020

/s/ Kevin M. Capuzzi

Kevin M. Capuzzi (DE No. 5462)
BENESCH, FRIEDLANDER, COPLAN &
   ARONOFF LLP
1313 North Market Street, Suite 1201
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
Email: kcapuzzi@beneschlaw.com

Manish K. Mehta (*admitted pro hac vice*)
Zaiba Baig (*admitted pro hac vice*)
BENESCH, FRIEDLANDER, COPLAN &
   ARONOFF LLP
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
Telephone: (312) 212-4949
Facsimile: (312) 757-9192
Email: mmehta@beneschlaw.com
Email: zbaig@beneschlaw.com

Charanjit Brahma (*admitted pro hac vice*)
BENESCH, FRIEDLANDER, COPLAN &
   ARONOFF LLP
One Montgomery Tower, Suite 2700
San Francisco, CA 94104
Telephone: (628) 600-2241
Facsimile: (628) 221-5828
Email: cbrahma@beneschlaw.com

*Attorneys for NortonLifeLock, Inc.*